UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**STERLING SAVINGS BANK, a
Washington Chartered Commercial Bank**,

          Plaintiff,

    v.

**THORNBURGH RESORT COMPANY
LLC, an Oregon Limited Liability
Company**,

          Defendant.

Case No. 3:12-cv-00255-KI

OPINION AND ORDER

    Charles R. Markley
    Sanford R. Landress
    Greene & Markley, P.C.
    1515 SW Fifth Ave., Suite 600
    Portland, OR 97201

        Attorneys for Plaintiff

Page 1 - OPINION AND ORDER

Gary Underwood Scharff
Law Office of Gary Underwood Scharff
621 SW Morrison St., Suite 1300
Portland, OR 97205

Heather A. Brann
P.O. Box 11588
Portland, OR 97211

      Attorneys for Defendant

KING, Judge:

Plaintiff Sterling Savings Bank ("Sterling") seeks a declaration that any claims Thornburgh Resort Company, LLC ("Thornburgh") makes against Sterling are invalid. Thornburgh, in turn, alleges Sterling breached its fiduciary duty to a surety, intentionally interfered with Thornburgh's business expectancy, tortiously breached the duty of good faith and fair dealing, and is liable under common law indemnity.

Pending before the Court are Sterling's Motion for Summary Judgment [54], Thornburgh's Motion for Partial Summary Judgment on Counterclaim I [61], and Thornburgh's Motion to Strike Sterling's Affirmative Defenses [63].

## BACKGROUND

Thornburgh began designing and obtaining permits for a destination resort on its land in about 2004. Most of the land had belonged to the grandfather of Thornburgh's principal, Kameron DeLashmutt. Jeff Parker and William Wilt formed Parker Group Investments, LLC ("PGI") to invest in Thornburgh's project. To effectuate that investment, Thornburgh, PGI, Parker, and Wilt entered into an Investment Agreement in 2007 giving PGI an interest in

Page 2 - OPINION AND ORDER

Thornburgh's property in exchange for PGI obtaining financing; Thornburgh also agreed to grant an interest in its property as security for the payment of any loan PGI obtained.

On November 19, 2007, Sterling Savings Bank loaned $10,956,000 to PGI pursuant to a promissory note (the "Note"). Parker and Wilt guaranteed the Note. Thornburgh was not a party to the Note. PGI, Thornburgh, and others executed and delivered to Sterling a Line of Credit Trust Deed on Thornburgh's property; the Trust Deed encumbered Thornburgh's real property and secured the Note.[1] The Note was also secured by cash owned by PGI in the amount of $7,229,655 ("Cash Collateral") held in a § 1031 exchange account. Parker executed an Assignment of Cash Account in favor of Sterling for this purpose.

The next day, on November 20, 2007, PGI and Thornburgh amended their Investment Agreement (for the fourth time) to specifically reference the $10,956,000 loan from Sterling.

Sterling released the loan proceeds to PGI, which passed the proceeds on to Thornburgh pursuant to a "pass-through-loan."

On December 11, 2007, unbeknownst to Thornburgh, Parker asked Sterling to disburse the Cash Collateral to pay down other debts Parker and Wilt owed to Sterling. Sterling agreed and it disbursed the Cash Collateral on December 17, 2007. It did not request replacement collateral immediately. There is evidence Sterling attempted to obtain replacement collateral several months later, but no evidence it succeeded.

The PGI loan fell into default. In February 2010, Thornburgh offered $5.1 million to buy the Note and Trust Deed from Sterling. Sterling countered with $9.5 million.

---

[1] The Trust Deed read, in relevant part: "THIS DEED OF TRUST, . . . IS GIVEN TO SECURE (1) PAYMENT OF THE INDEBTEDNESS AND (2) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THIS DEED OF TRUST." Sivelle Decl. Ex. 2, at 2 [56].

Page 3 - OPINION AND ORDER

Sterling commenced a non-judicial foreclosure of the Trust Deed in October 2010.

Parker approached Sterling to buy the loan, but Sterling informed him it would not sell to defaulting borrowers; it would sell to third parties, however. Parker formed Central Oregon Investment Holdings, LLC, for the purpose of buying the loan. Two days before Sterling was scheduled to foreclose, Sterling sold the Note and Trust Deed to Central Oregon Investment Holdings, LLC, for $4 million. Parker's Assignment of Cash Account was included among a reference to other loan documents included in the sale. Central Oregon then sold the Note, Trust Deed, and other loan documents, including the Assignment of Cash Account, to Loyal Land, LLC. Loyal Land delayed the foreclosure sale date.

On March 11, 2011, Thornburgh filed for Chapter 11 bankruptcy in an attempt to stop Loyal's foreclosure. Loyal quickly sought an order for relief from the automatic stay so it could complete the foreclosure. Thornburgh opposed Loyal's motion and initiated discovery. As part of discovery, Thornburgh took the deposition of John Sears, who had been an employee of Sterling's subsidiary until June 2008. Sears testified that Sterling had disbursed the Cash Collateral and had not obtained replacement collateral, but Sears had no knowledge of the loan or collateral after he left.

Thornburgh brought an adversary proceeding in Bankruptcy Court against Sterling and other defendants in May 2011. It alleged Sterling caused Thornburgh $20 million dollars worth of damage by, among other things, disbursing the Cash Collateral without obtaining replacement

collateral.[2]  Sterling and the other defendants in that case admitted to the release but denied "all other allegations."  DeLashmutt Decl. Ex. S, at ¶11 [62].

The Bankruptcy Court granted Loyal relief from the automatic stay on June 16, 2011.

One day before Loyal was scheduled to foreclose, Thornburgh brought a declaratory and quiet title action against Loyal and others in Deschutes County.  Thornburgh included an allegation in that case, too, about Sterling's improper release of the Cash Collateral.[3]

Loyal's nonjudicial foreclosure of the Trust Deed occurred on August 31, 2011.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The initial burden is on the moving party to point out the absence of any genuine issue of material fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the

---

[2] Thornburgh alleged, "In or about early 2008, without notice to or consent by debtor, Parker and his 'private banker' at Sterling, Gordon Holman, induced Sterling to release the $7.2 million in Parker Cash held as security for the Sterling Loan, without paying down the Sterling Loan or providing replacement collateral.  That collateral release by PGI and Sterling greatly increased the debtor's exposure to loss of the Property in the event of PGI's default under the Sterling Loan."  Ravassipour Decl. Ex. 10, at ¶ 19 [57].

[3] Thornburgh alleged, "In or about February 2008, without notice to or consent by Plaintiff called for in the IA, Parker and his "private banker" at Sterling induced Sterling to release the $7.2 million in Parker Cash held as collateral for the Sterling Loan, without paying down the Sterling Loan in the amount of the release or providing replacement collateral.  That collateral release by PGI and Sterling greatly increased the Plaintiff's exposure to loss of the Property in the event of PGI's default under the Sterling Loan."  Ravassipour Decl. Ex. 11, at ¶ 14.

Page 5 - OPINION AND ORDER

court "must view the evidence on summary judgment in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." Nicholson v. Hyannis Air Service, Inc., 580 F.3d 1116, 1122 n.1 (9th Cir. 2009) (citation omitted).

## DISCUSSION

This dispute centers on Sterling's disbursement of the Cash Collateral without informing Thornburgh or obtaining replacement collateral. Both parties agree, for purposes of resolving these motions, that the disbursement occurred. The only question is whether Thornburgh can remedy the disbursement in this court at this time.

Thornburgh argues that by disbursing the Cash Collateral Sterling impaired the collateral securing the Note and, as a result, Thornburgh has various tort claims for legal damages, including: breach of fiduciary duty, intentional interference with business expectancy, and tortious breach of the duty of good faith and fair dealing. Thornburgh also alleges a claim for common law indemnity. Sterling, in turn, seeks a declaration that all of Thornburgh's claims are invalid because, as a matter of law, Thornburgh cannot allege the claims it brings. Sterling argues the alleged impairment of collateral created, at most, only an *equitable defense* to the *foreclosure*, which Thornburgh lost when it failed to timely assert that defense against Loyal in the foreclosure action. As a result, it contends, Thornburgh cannot seek relief in this Court.

I.  Suretyship

Both parties agree that Thornburgh was a surety to Sterling. As a surety, Thornburgh alleges, Sterling owed it a fiduciary duty and Sterling breached that duty by disbursing the Cash Collateral.

> To explain:
>
> A surety, in the broad sense, is one who is liable for the debt or obligation of another, whether primarily or secondarily, conditionally or unconditionally. In other words, the term surety includes anyone who is bound on an obligation which, as between himself and another person who is bound to the obligee for the same performance, the latter obligor should discharge. . . . By such terminology, guarantors and indorsers are kinds of sureties.

Man-Data, Inc. v. B&A Auto., Inc., 247 Or. App. 429, 435 n.4, 270 P.3d 318 (2011) (quoting Laurence P. Simpson, Handbook on the Law of Suretyship 6, 8-10 (1950)).

> Specifically, the legal relationship of suretyship is formed when:
>
> pursuant to contract (the "secondary obligation"), an obligee has recourse against a person ("the secondary obligor") or that person's property with respect to the obligation (the "underlying obligation") of another person (the "principal obligor") to that obligee[.]

Restatement (Third) of Suretyship and Guaranty § 1(1)(a) (1996) (hereinafter "Restatement").

The parties agree Sterling was the obligee, PGI was the principal obligor, and Thornburgh was the secondary obligor. However, the parties have different views about how the suretyship was created.

Sterling contends Thornburgh's execution and delivery of the Trust Deed to Sterling created a suretyship relationship. To invoke the words of the Restatement, the secondary obligation was created "by contract granting the obligee [Sterling] a security interest in property of the secondary obligor [Thornburgh] to secure the underlying obligation [the Note]." Id. § 2. Pursuant to that "secondary obligation . . . the obligee [Sterling] has recourse against the secondary obligor [Thornburgh] or its property in the event of the failure of the principal obligor [PGI] to perform the underlying obligation [pay the Note.]" Id. § 1(2)(b)(ii).

Page 7 - OPINION AND ORDER

Thornburgh argues the suretyship arose from the Investment Agreement between Thornburgh and PGI in which Thornburgh agreed to secure loans with its property. The language on which it relies reads, "As security for the payment of the Loan, [Thornburgh] agrees to grant a security interest in all of its real property . . . ." DeLashmutt Decl. Ex. A, Inv. Agreement § 4.1. Amendment 4 extended the Investment Agreement to Sterling and required Thornburgh to "take all steps reasonably requested [by Sterling or PGI] in connection with the Collateral." Id., Amend. 4, § 7. Thornburgh argues it "performed" its obligation when it executed the Trust Deed to Sterling.

I cannot accept Thornburgh's argument. In order for Thornburgh to have suretyship status at all, the secondary obligation must give Sterling recourse against Thornburgh's property to fulfill PGI's obligation. The Investment Agreement does not permit Sterling any recourse against Thornburgh. Indeed, Sterling is not a party to the Investment Agreement.

Thornburgh disputes the notion that the Trust Deed could be the contract to which the Restatement refers. In a misquotation of Wills v. Harris, 57 Or. App. 712, 715, 646 P.2d 39 (1982), Thornburgh argues that "a trust deed is not a contract." That court actually states, "The trust deed is not a contract *subject to the statute*" at issue in the case. Contrary to Thornburgh's understanding, the Restatement explains, "[t]he secondary obligation may be created . . . (c) by the contract granting the obligee a security interest in property of the secondary obligor to secure the underlying obligation . . . ." Restatement § 2. The "contract granting . . . a security interest in property" is the Trust Deed. See Sivelle Decl. Ex. 2 ("For valuable consideration, represented in the Note dated November 19, 2007, in the original principal amount of $10,956,000, from Borrower [PGI] to Lender [Sterling], Grantor [Thornburgh] conveys to Trustee for the benefit of

Page 8 - OPINION AND ORDER

Lender as Beneficiary all of Grantor's right, title, and interest in and to the following described real property . . ."); see also Domingo v. Anderson, 325 Or. 385, 387, 938 P.2d 206 (1997) (describing "contractual terms of the trust deed").

In sum, when Thornburgh assigned the Trust Deed to Sterling, it created the suretyship relationship. Having resolved the question of how the suretyship was created, I now proceed to address Thornburgh's remedy for Sterling's alleged impairment of Thornbugh's suretyship status.

II.     What Remedy is Available to Thornburgh?

I assume for purposes of resolving these summary judgment motions that Sterling impaired the collateral. Accordingly, the question is what remedy Thornburgh has for that wrongful deed. Sterling asserts (1) Thornburgh was limited to raising the alleged impairment of collateral as a defense to the foreclosure proceeding (2) because Thornburgh knew about the alleged impairment of collateral *before* the foreclosure. Thornburgh argues it can bring this lawsuit because Sterling impaired the collateral *after* Thornburgh performed.

According to the Restatement, normally impairment to collateral simply *discharges* the secondary obligor's requirement to perform. Only in very specific and limited circumstances can the secondary obligor (Thornburgh) bring a claim against the obligee (Sterling) for impairment of collateral.

Specifically, Thornburgh has a claim against Sterling in the following circumstances:

> (a) If Sterling impaired Thornburgh's status *after* Thornburgh *performed* any portion of the secondary obligation; or
>
> (b) If Sterling impaired Thornburgh's status *before* Thornburgh performed, if Thornburgh then *performed*: (i) without knowledge of the impairment; (ii) for

Page 9 - OPINION AND ORDER

the benefit of an intended beneficiary who can enforce the secondary obligation notwithstanding such impairment; or (iii) under business compulsion.

Restatement § 37(4) (emphasis added). I address each of these circumstances in turn.

        A.      Did Sterling Impair Thornburgh's Status *After* Thornburgh *Performed*?

Section 37(4)(a) of the Restatement allows Thornburgh to bring a claim against Sterling if Sterling impaired Thornburgh's status *after* Thornburgh *performed* any portion of the secondary obligation.

The question is what "perform" means in the Restatement. Thornburgh argues it met § 37(4)(a)'s performance requirement when it conveyed its property interest to Sterling via the Trust Deed. A surety, according to Thornburgh, unconditionally pledges property (here, by way of the Trust Deed) to be converted to cash by the obligee in a foreclosure sale upon default by the primary obligor. Accordingly, Thornburgh argues, it "performed" fully (or at least partially) in November 2007 by delivering its Trust Deed to Sterling, thereby irrevocably pledging its property to secure payment of the loan. Thus, it can bring a suit against Sterling because Sterling impaired Thornburgh's status (by disbursing the Cash Collateral) after Thornburgh performed its secondary obligation. Sterling argues "perform" means paid a part of the debt.

As I explained above, Thornburgh's execution and delivery of the Trust Deed to Sterling *created* the suretyship relationship between Thornburgh and Sterling. Creation is not the same as performance. The only performance Sterling required from Thornburgh was payment of the debt if PGI defaulted. See Sivelle Decl. Ex. 2, at 2 ("THIS DEED OF TRUST . . . IS GIVEN TO SECURE (1) PAYMENT OF THE INDEBTEDNESS AND (2) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THIS DEED OF TRUST."). Here, Thornburgh *performed*

Page 10 - OPINION AND ORDER

the underlying obligation (i.e., paid PGI's debt) when Loyal foreclosed on Thornburgh's property and applied the bid amount to PGI's unpaid Note on August 31, 2011.  The alleged impairment of collateral occurred long before, in late 2007.  Accordingly, Thornburgh cannot sue Sterling for impairment of collateral under § 37(4)(a) of the Restatement because the impairment did not occur *after* Thornburgh performed.

        B.      <u>Did Sterling Impair Thornburgh's Status Before Performance and are the Other Criteria Met?</u>

Alternatively, § 37(4) of the Restatement permits Thornburgh to sue Sterling in the following circumstances:

"(b) If Sterling impaired Thornburgh's status *before* Thornburgh performed (i.e., by foreclosure of property), and Thornburgh then *performed* (i.e., by foreclosure of property): (i) *without knowledge* of the impairment; (ii) for the benefit of the intended beneficiary who can enforce the secondary obligation notwithstanding such impairment;  or (iii) under business compulsion."  Restatement § 37(4) (emphasis added).

        1.      <u>Thornburgh's Knowledge of the Impairment</u>

The question under § 37(4)(b)(i) is whether Thornburgh had knowledge of the disbursed Cash Collateral at the time of the foreclosure (i.e. when it performed).  Sterling argues Thornburgh had actual knowledge.  Thornburgh learned on May 3, 2011 when its attorney deposed Sears that Sterling had disbursed the Cash Collateral.  In its Adversary Proceeding in the Bankruptcy Court, which it filed on May 17, 2011, Thornburgh publicly confirmed its knowledge that Sterling had disbursed the Cash Collateral and failed to obtain replacement collateral.  Finally, on August 30, 2011, the day before the foreclosure, Thornburgh again demonstrated its

Page 11 - OPINION AND ORDER

knowledge when it alleged in its lawsuit against PGI, Parker, Loyal and others that Sterling had disbursed the collateral and failed to obtain replacement collateral. The foreclosure took place on August 31, 2011. Thornburgh failed to seek a temporary restraining order or preliminary injunction to stop the foreclosure, and it failed to assert its equitable defense of impairment of collateral at that time.

Thornburgh unsuccessfully suggests issues of fact preclude summary judgment as to its knowledge about the status of the Cash Collateral. For example, it disputes that the Sears deposition proves Thornburgh's actual knowledge of the disbursement since Sears ceased working for Sterling in June 2008 and Sterling could have replaced the collateral after Sears' departure. Additionally, Thornburgh points to Sterling's attorney's statement at the beginning of Sears' deposition that he objected to the deposition "to the extent Mr. Sears is being questioned as a former officer or employee of Sterling." Scharff Decl. Ex. U, at 3:16-18 [72].[4] Thornburgh also points to Sterling's answer to the complaint Thornburgh filed in its adversary proceeding in which Sterling admitted the Cash Collateral had been disbursed, but denied Thornburgh's allegation that Sterling had not obtained replacement collateral. DeLashmutt Decl. Ex. S, at ¶ 11. Thornburgh contends it should have been permitted to rely on Sterling's denials. The Cash Collateral, as reflected in Parker's Assignment of Cash Account in favor of Sterling, was referenced among the loan documents Sterling sold. In short, Thornburgh claims it did not actually know for certain that Thornburgh had never obtained replacement collateral until May 9, 2014, when it received Sterling's responses to discovery requests in this litigation.

---

[4]The complete deposition transcript reflects Sterling's objection to any question about "Sterling's policies and procedures regarding this loan." Scharff Decl. Ex. U, at 3:12-21.

Thornburgh seems to suggest it must have had knowledge of a fully admitted, conclusive, unopposed impairment of collateral. Nothing in the Restatement suggests such a level of knowledge is required. In any event, the record makes it apparent that Thornburgh could not have been deceived by Sterling's answer, or the fact that the Assignment of Cash Account was included in the loan documents Sterling sold, because Thornburgh made the very same allegation three months later, the day before Loyal's foreclosure sale. The undisputed public record shows Thornburgh's full knowledge of the alleged impairment of collateral–in two separate complaints in two separate courts. Accordingly, Thornburgh cannot seek refuge in § 37(4)(b)(i) to justify this litigation.

                    2.      <u>Whether the Beneficiary Can Enforce</u>

Section 37(4) of the Restatement also permits Thornburgh to sue Sterling if Sterling disbursed the Cash Collateral before the foreclosure sale, and the foreclosure sale benefitted an entity "who can enforce the secondary obligation notwithstanding such impairment." § 37(4)(b)(ii). Here, Thornburgh argues the foreclosing court may have refused to punish Loyal for Sterling's conduct and may have allowed Loyal to foreclose notwithstanding Thornburgh's defense of impaired collateral.

As Sterling explains, however, Sterling sold the Note and Trust Deed to Central Oregon Investment holdings on March 2, 2011, just two days before the date for foreclosure. The Note was in default at the time of the sale. The sale was "as is, with all faults, without recourse, and without representation and/or warranty of any kind or nature." Sivelle Decl. Ex. 8, ¶ 5(c). Loyal took title on March 7, 2011. Loyal was no more than a "holder" of the Note and Trust Deed under ORS 71.2010(2)(u). It was not a holder in due course because it took the Note and Trust

Page 13 - OPINION AND ORDER

Deed with notice of the default. ORS 73.0302 (a holder in due course takes the instrument for value, in good faith, and without notice that it is overdue, has been dishonored, that there is an uncured default, or any defense against or claim to it on the part of any person). In addition, Thornburgh's defense–impairment of collateral– is a "personal defense" under ORS 73.0305(1)(b). Only a holder in due course takes free of such a personal defense. ORS 73.0305(2). Because Thornburgh could have asserted its impairment of collateral defense against Loyal, § 37(4)(b)(ii) does not apply.

### 3. Whether Thornburgh was Operating Under Business Compulsion

The final circumstance, as set forth in the Restatement, allowing Thornburgh to sue Sterling for impairment of collateral is when the secondary obligor performs "under business compulsion." § 37(4)(b)(iii). Thornburgh argues it was financially distressed. As proof, it points to its Chapter 11 bankruptcy filing and argues it had no choice but to allow the foreclosure to occur.

Sterling responds, however, that Thornburgh had the financial wherewithal to file a lawsuit against the various players just the day before the foreclosure occurred. Further, Sterling argues, "business compulsion" is a form of duress, meaning that Thornburgh was forced to do some act against its will. Or. Bank v. Nautilus Crane & Equip. Corp., 68 Or. App. 131, 142, 683 P.2d 95 (1984). A lack of funds is not something that forced Thornburgh to act against its will. Section 37(b)(4)(iii) does not apply to allow Thornburgh to bring its counterclaims against Sterling.

C.  Conclusion

In short, instead of a basis for counterclaims, in this context, Thornburgh's alleged impairment of collateral constitutes only a defense to liability under the suretyship contract. See, e.g. Brown & Co. v. Rathburn, 10 Or. 158 (1882); Hoffman v. Habighorst, 38 Or. 261, 271, 63 P. 610 (1901); Cottage Grove Lumber Co. v. Lillegren, 227 Or. 24, 32, 360 P.2d 927 (1961) ("[a] surety may proceed in equity against the creditor for protection and relief as to the surety's rights and liabilities and compel a release from liability by reason of the creditor's acts"). Accordingly, I grant Sterling's Motion for Summary Judgment on its request for declaratory relief.[5]  I dismiss all of Thornburgh's counterclaims.

III.  Sterling's Claim for Attorney Fees

Sterling seeks summary judgment on its claim for attorneys' fees.  Under ORS 20.105(1), I must award attorneys' fees if I determine there is "no objectively reasonable basis" for Thornburgh's counterclaims.[6]  According to Sterling, rather than Thornburgh suing the individual who failed to assert Thornburgh's equitable defense in the proper proceeding, Thornburgh improperly brought groundless legal claims against Sterling.

Thornburgh asks the Court to reject Sterling's claim for attorney fees, arguing only that the reasoning (which I rejected above) supports its counterclaims.

---

[5]I do not address Sterling's alternative argument that Thornburgh's claims should run against Loyal, not Sterling, as the foreclosing entity.  Because Sterling made this argument in its Reply brief, Thornburgh did not have a fair opportunity to respond.

[6]In a diversity action, state law governs the award of attorneys' fees when the fee award is "connected to the substance of the case."  Northon v. Rule, 637 F.3d 937, 938 (9th Cir. 2011) (per curiam).

To determine whether there was an objectively reasonable basis for asserting a claim, the question is "whether there is evidence in the record to support the claim–that is, whether the party's claim is entirely devoid of legal or factual support at the time it was made." Lenn v. Bottem, 221 Or. App. 241, 248, 190 P.3d 399 (2008) (internal quotation marks and citation omitted).  "The fact that a claim is ultimately unsuccessful does not necessarily mean that the party's position was objectively unreasonable." Morasch v. Hood, 232 Or. App. 392, 404, 222 P.3d 1125 (2009).

Proper application of the principles in the Restatement demonstrate Thornburgh had no reasonable basis to bring its counterclaims against Sterling in this court.  As a result, Sterling, as the prevailing party, is entitled to its attorney fees.  However, I note for the benefit of the parties I will carefully consider objections to the amount of attorney fees requested by Sterling considering the factors outlined in ORS 20.075.  I suggest the parties confer and attempt to settle Sterling's attorney fees request.  I will be very reluctant to compensate Sterling for time it expends on litigating attorney fees.

## CONCLUSION

For the foregoing reasons, Sterling Savings Bank's Motion for Summary Judgment [54] is granted.  Thornburgh Resort Company, LLC's Motion for Partial Summary Judgment [61] is denied.  Thornburgh Resort Company, LLC's Motion to Strike or Dismiss Sterling's Affirmative Defenses [63] is denied as moot.  Sterling Savings Bank is entitled to a judgment declaring Thornburgh's claims invalid and dismissing Thornburgh's counterclaims with prejudice.

Sterling is directed to submit a proposed form of judgment by January 20, 2015.

IT IS SO ORDERED.

DATED this   5th   day of January 2015.

      /s/ Garr M. King
Garr M. King
United States District Judge

Page 17 - OPINION AND ORDER